Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| COOPERATIVA DE AHORRO Y CRÉDITO DE SANTA ISABEL<br><br>Apelante<br><br>V.<br><br>JOEL DEDÓS COLÓN<br><br>Apelado | KLAN202400776 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso Núm.:<br>J CD2009-0666<br><br>Sobre:<br>Cobro de Dinero y Ejecución de Hipoteca |

Panel integrado por su presidente, el Juez Rodríguez Casillas, Juez Marrero Guerrero y Juez Campos Pérez.

Marrero Guerrero, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 29 de agosto de 2025.

Comparece la Cooperativa de Ahorro y Crédito de Santa Isabel (CACSI o apelante) en solicitud de que revisemos una *Sentencia* emitida el 16 de septiembre de 2022 por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI).[1] Mediante el referido dictamen, el Foro *a quo* declaró No Ha Lugar la *Demanda* de cobro de dinero y ejecución hipotecaria presentada contra el Sr. Joel Dedós Colón (señor Dedós Colón o apelado) y Con Lugar la *Reconvención* por fraude y engaño en la tramitación, concesión, otorgamiento y desembolso del préstamo instada por el demandado.

Con el beneficio de la Transcripción de la Prueba Oral (TPO) estipulada por las partes, procedemos a resolver. Se anticipa la revocación de la *Sentencia* apelada.

## I.

Este caso se originó el 1 de junio de 2009, fecha en que CACSI presentó una *Demanda* en contra del Sr. Dedós Colón por cobro de dinero y ejecución hipotecaria garantizada con un pagaré.[2] En esta, alegó que el apelado adeudaba $147,807.19 por concepto de principal

---

[1] Apéndice de *Apelación*, Anejo 9, págs. 614-659.
[2] *Íd.*, Anejo 2, págs. 549-553.

no pagado de un préstamo hipotecario asegurado con un inmueble, así como intereses, recargos, deuda con el Centro de Recaudación de Ingresos Municipales (CRIM) y otros gastos relacionados al proceso judicial. Por consiguiente, solicitó que se declarara Con Lugar la *Demanda* y se ordenara la venta en pública subasta de la propiedad otorgada en garantía hipotecaria, entre otros remedios.

Posteriormente, el 29 de abril de 2010, el Sr. Dedós Colón presentó una *Contestación a Demanda y Reconvención*.[3] Entre sus alegaciones, sostuvo que CACSI incurrió en fraude en la tramitación del préstamo y en el otorgamiento de la escritura de constitución de hipoteca. Arguyó que la apelante violó la *Truth in Lending Act*, 15 USC sec. 1601 *et seq* (TILA), al no desglosar las partidas previo a concederle el préstamo y cobrar cantidades superfluas e infladas con la intención de defraudarlo. Alegó que los representantes de la CACSI incumplieron sus deberes fiduciarios hacia su persona como socio-accionista al variar su solicitud de préstamo para enriquecerse injustamente, lo que le ocasionó un daño económico ascendente a $147,807.19 y angustias mentales estimadas en $75,000.00.

En respuesta, el 27 de mayo de 2010, CACSI presentó una *Réplica y Contestación a Reconvención*, en la que argumentó que el apelado utilizó el dinero prestado para cancelar deudas con diversos acreedores y atender otros asuntos personales.[4]

El juicio en su fondo se celebró entre el 5 de marzo y el 14 de noviembre de 2018. Durante ese período, ambas partes presentaron múltiples testigos y peritos, cuyos testimonios este Tribunal evaluó en su totalidad y a continuación se sintetizan:

**Katiria M. Pérez López**

La licenciada Pérez López explicó que en el 2007 trabajaba como abogada-notario en la oficina del Lcdo. Jimmy Soto Ledesma,

---

[3] *Íd.*, Anejo 3, págs. 553-560.
[4] *Íd.*, Anejo 3, págs. 561-563.

quien tenía un contrato con CACSI.[5] Afirmó que conocía al señor Dedós Colón, quien le entregó varios documentos en 2007, entre ellos dos (2) escrituras notariales, unas planillas del CRIM y del Departamento de Hacienda, un pagaré y un contrato de prenda.[6] Declaró que autorizó la Escritura Núm. 4 del 31 de enero de 2007 sobre liquidación de bienes gananciales que otorgaron el señor Dedós Colón y la Sra. Lydia Peña Rodríguez.[7] Asimismo, indicó que ese mismo día autorizó la Escritura Núm. 5 sobre constitución de una hipoteca en garantía de un pagaré que otorgaron el señor Dedós Colón y el Sr. Elvin Rodríguez, como representante de CACSI.[8]

Según la testigo, el señor Dedós Colón firmó la escritura de constitución de hipoteca en su presencia. Además, sostuvo que lo identificó personalmente, debido a que ambos mantuvieron contacto tanto en persona como por teléfono.[9] Enfatizó que, el 31 de enero de 2007, ni el señor Dedós Colón ni su exesposa le entregaron sus licencias de conducir para fines de la identificación.[10] Asimismo, puntualizó que el Lcdo. Carlos Fernández Nadal estuvo presente durante el otorgamiento del documento público en representación del señor Dedós Colón, sin expresar reparo durante el proceso.[11]

Manifestó que fotocopió tanto la escritura como el pagaré, del cual entregó su original a la señora Morales Cruz, quien se desempeñaba como oficial encargada del cierre del préstamo.[12] Además, afirmó que presenció cuando el apelado firmó el pagaré bajo el affidávit núm. 644, sin reparo alguno de su parte ni de su representante legal.[13] La testigo lo reiteró de la siguiente manera:

---

[5] TPO del 5 de marzo de 2018, pág. 58, líneas 1-22.
[6] *Íd.*, pág. 59, líneas 1-8.
[7] *Íd.*, pág. 60, líneas 15-23; pág. 61, líneas 1-19; pág. 69, líneas 1-6.
[8] *Íd.*, pág. 69, líneas 7-23.
[9] *Íd.*, pág. 70, líneas 1-17; TPO del 6 de marzo de 2018, pág. 84, líneas 16-23.
[10] TPO del 13 de julio de 2018, pág. 88, líneas 8-14.
[11] TPO del 5 de marzo de 2018, pág. 70, líneas 19-23; pág. 71, líneas 1-8.
[12] *Íd.*, pág. 71, líneas 9-22; pág. 72, líneas 1-21.
[13] TPO del 5 de marzo de 2018, pág. 73, líneas 4-21; TPO del 6 de marzo de 2018, pág. 87, líneas 19-23; pág. 88, líneas 1-3.

[Representante legal]: Ese pagaré hipotecario, ¿quién lo firmó?

[Testigo]: El Sr. Joel Dedós Colón.

[Representante legal]: ¿Quién le tomó la firma al Sr. Joel Colón Dedós?

[Testigo]: Yo.

[Representante legal]: Usted le tomó la firma.

[Testigo]: Sí.

[Representante legal]: Eh, ¿qué le autoriza a usted a tomar esa firma?

[Testigo]: Yo soy notario público y en mi función como notario [autoricé], le tomé la firma al Sr. Joel Dedós Colón.

[Representante legal] Ese documento que usted tiene ante sí, ¿cómo lo compara con el que usted firmó originalmente?

[Testigo]: El mismo documento.

[Representante legal]: Es el mismo documento. [Si] alguien dijera que ahí hay una firma falsificada, ¿está diciendo la verdad?

[…]

[Testigo]: Yo no sé lo que dijo el Sr. Joel Dedós, yo puedo dar fe como notario de lo que se hizo ante mí, él ante [mí] firmó este pagaré que yo tengo copia aquí, tengo una copia en mí, en mi Protocolo también y yo puedo dar fe de eso, de que él firmó ante mi este documento que yo tengo aquí y tengo en mi Protocolo.

[…]

[Representante legal]: [El perito calígrafo] Pedro Figueroa se sentó allí y declaró que eso era una burda imitación, ¿qué usted tiene que decir a eso, [si] algo?

[…]

[Testigo]: Eso es incorrecto.

[…]

[Representante legal]: Muy bien. Es incorrecto, yo le pregunto, ¿usted cómo identificó al señor Joel Dedós?

[Testigo]: Mediante la tarjeta electoral.

[Representante legal]: ¿Por qué sí recuerda?

[Testigo]: Porque no tenía, mi recuerdo, eso fue lo que se me proveyó porque entiendo que la licencia de conducir del señor Dedós estaba expirada en ese momento.

[Representante legal]: Estaba expirada. ¿Cómo usted está tan segura de que usted identificó al Sr. Joel Dedós con la tarjeta electoral y no con la licencia de conducir?

[Testigo]: Porque así lo hice constar en la escritura.[14]

Asimismo, manifestó que notarizó un contrato de prenda que el señor Dedós Colón firmó en igual fecha, posterior a suscribir el pagaré, sin reparo alguno.[15] Resaltó que, como notario, su función consistía en asesorar legalmente a ambas partes sobre el marco legal de la transacción, sin representar intereses individuales.[16]

**Rosa Rivera**

La testigo sostuvo que desde agosto de 2016 laboraba como oficinista de digitalización en CACSI, por lo que estaba encargada de generar las copias de los expedientes hipotecarios de CACSI, sobre los cuales solo ella tenía contacto.[17] Además, aseguró que las copias eran iguales al expediente hipotecario del señor Dedós Colón.[18]

**José R. Velasco González**

El testigo declaró que era el administrador de documentos de la Corporación Pública para la Supervisión y Seguro de Cooperativas de Puerto Rico (COSSEC).[19] Indicó que la copia certificada entregada al tribunal era fiel y exacta al expediente físico bajo su custodia, con excepción de las grabaciones de las vistas administrativas.[20]

**Vivian Morales Cruz**

La testigo indicó que desde agosto de 2011 trabajaba como presidenta ejecutiva de CACSI, lugar donde laboró como vicepresidenta del Departamento de Crédito entre el 2006 y 2007.[21] En su función de vicepresidenta del Departamento de Crédito, recibía a los clientes, procesaba sus solicitudes de préstamo y realizaba los

---

[14] TPO del 13 de julio de 2018, págs. 63-67, líneas 1-22; pág. 71, líneas 1-11.
[15] TPO del 5 de marzo de 2018, pág. 74, líneas 5-23; TPO del 6 de marzo de 2018, pág. 89, líneas 2-3.
[16] TPO del 6 de marzo de 2018, pág. 81, líneas 11-22; pág. 82, líneas 1-2.
[17] TPO del 6 de marzo de 2018, pág. 105, líneas 21-22; pág. 106, líneas 1-22; pág. 108, líneas 2-23; pág. 109, línea 1-23; pág. 110, líneas 1-3; pág. 111, líneas 12-21.
[18] *Íd.*, pág. 107, líneas 15-23; pág. 108, líneas 1-5.
[19] TPO del 9 de marzo de 2018, pág. 12, líneas 5-7.
[20] *Íd.*, pág. 12, líneas 21-23; pág. 13, líneas 1-21.
[21] *Íd.*, pág. 25, líneas 10-17; pág. 26, líneas 1-22.

reembolsos.[22] Explicó que conocía al apelado, puesto que era cliente de CACSI y le emitió los cheques durante el cierre del préstamo garantizado con una propiedad comercial.[23] Testificó que estaba familiarizada con los expedientes de los socios de CACSI, lo que le permitió identificar el expediente del señor Dedós Colón.[24] Manifestó que el pagaré original que el apelado firmó contenía los términos del préstamo, incluyendo lo siguiente:[25]

> Valor recibido, me obligo solidariamente a pagar a la Cooperativa de Ahorro y Crédito de Santa Isabel o a su orden la cantidad de ciento veintiocho mil dólares ($128,000.00) con intereses al 9% anual sobre el balance pendiente. Dicho principal e intereses serán pagaderos en las oficinas de dicha cooperativa o en cualquier otro sitio que el tenedor designe por escrito en 360 plazos mensuales de mil veintinueve dólares con noventa y dos centavos ($1,029.92) [...] comenzando el primer pago el día 1ro de febrero del [...] 2007 [...] y así sucesivamente el día primero de cada mes subsiguiente hasta el pago total de principal e intereses.[26]

La testigo declaró que se entregó un contrato de prenda, el cual firmaron tanto el señor Dedós Colón, el Sr. Elvin Rodríguez Colón como representante de CACSI, así como la licenciada Pérez López.[27]

Especificó que en la originación del préstamo se detalló que su propósito fue la liquidación de bienes gananciales y el pago de varias deudas.[28] Además, detalló las siguientes finalidades de algunos cheques que se originaron como producto del préstamo:

1) Cheque 144290 de $18,854.26 a favor del Sr. Dedós Colón.[29]
2) Cheque 144138 de $2,904.34 a favor de Sears para saldar y cancelar una deuda.[30]
3) Cheque 144132 de $27,146.00 a favor de la Sra. Lydia Peña Rodríguez.[31]

---

[22] *Íd.*, pág. 27, líneas 1-10.
[23] *Íd.*, pág. 28, lías 5-9; TPO del 2 de abril de 2018, pág. 111, líneas 20-23.
[24] TPO del 9 de marzo de 2018, pág. 40, líneas 10-22; pág. 42, líneas 13-22; pág. 43, líneas 4-20; pág. 44, líneas 1-23; pág. 45, líneas 1-23; pág. 46, líneas 1-2; pág. 6-19; pág. 48, líneas 2-23; pág. 49, líneas 1-6; pág. 52, líneas 22-23; pág. 1-5.
[25] *Íd.*, pág. 50, líneas 13, 20.
[26] *Íd.*, pág. 51, líneas 15-23; pág. 52, líneas 1-16.
[27] *Íd.*, pág. 52, líneas 17-19; pág. 54, líneas 9-23; pág. 55, líneas 1-6.
[28] *Íd.*, pág. 61, líneas 12-21.
[29] *Íd.*, pág. 72, líneas 8-21; pág. 73, líneas 1-7.
[30] *Íd.*, pág. 70, líneas 7-9; pág. 219, líneas 1-22; pág. 220, líneas 1-22.
[31] *Íd.*, pág. 70, líneas 9-12; pág. 221, líneas 2-15.

4) Cheque 144137 de $7,265.23 a favor del Banco Popular para cancelar una deuda de Banco Popular Card Products Division.[32]
5) Cheque 144136 de $8,995.57 a favor de Home Depot para saldar y cancelar una cuenta de Home Depot Credit Services.[33]
6) Cheque 144135 de $8,534.96 a favor de Santander de Puerto Rico para saldar y cancelar una cuenta del Sr. Dedós Colón.[34]
7) Cheque 144134 de $2,266.85 a favor de Citibank para saldar y cancelar una deuda contraída con Citi Cards.[35]
8) Cheque 144133 de $3,000.00 a favor de la Secretaría del Tribunal.[36]
9) Cheque 144131 de $12,195.43 a favor de Citibank para cancelar una cuenta.[37]
10) Cheque 144130 de $21,562.58 a favor de CACSI para la cancelación de una deuda previa que el Sr. Dedós Colón adquirió con el apelante.[38]
11) Cheque 142244 de $800.00 a favor de Alfredo Quirindongo para pagar la tasación en el caso hipotecario.[39]

Sobre el particular, declaró que el apelado no se rehusó al desembolso de dinero que CACSI le realizó.[40] No obstante, indicó que, al momento, el apelado no había pagado la deuda exigida.[41] De otra parte, testificó que como parte del procedimiento en COSSEC, tanto CACSI como el señor Dedós Colón debían realizar unas gestiones que el apelado no llevó a cabo.[42]

**Joel Dedós Colón**

El apelado testificó que la Sra. Morales Cruz lo citó el 31 de enero de 2007 a CACSI para celebrar el cierre del préstamo hipotecario que solicitó para la consolidación de deudas personales y la división de bienes gananciales.[43] Indicó que llegó a las instalaciones de CACSI a las 5:00 de la tarde, acompañado del

---

[32] *Íd.*, pág. 70, líneas 12-14; pág. 221, líneas 16-23; pág. 222, líneas 1-23; pág. 223, línea 1.
[33] *Íd.*, pág. 70, líneas 14-17; pág. 223, líneas 16-23; pág. 224, líneas 1-23.
[34] *Íd.*, pág. 71, líneas 3-6; pág. 225, líneas 1-23; pág. 226, líneas 1-17.
[35] *Íd.*, pág. 71, líneas 7-9; pág. 226, líneas 18-23; pág. 227, líneas 1-22; pág. 228, líneas 1-11.
[36] *Íd.*, pág. 71, líneas 9-11; pág. 228, líneas 14-23; pág. 229, líneas 1-4.
[37] *Íd.*, pág. 71, líneas 11-14; pág. 229, líneas 5-21; pág. 230, líneas 1-3.
[38] *Íd.*, pág. 238, líneas 3-22; pág. 239, líneas 1-3; TPO del 2 de abril de 2018, pág. 142, líneas 4-16; pág. 190, líneas 9-22; pág. 191, líneas 1-23; pág. 192, líneas 1-17.
[39] TPO del 9 de marzo de 2018, pág. 240, líneas 4-18; pág. 241, líneas 1-23; pág. 242, líneas 1-7.
[40] *Íd.*, pág. 66, líneas 6-11.
[41] *Íd.*, pág. 246, líneas 7-12.
[42] TPO del 14 de noviembre de 2018, pág. 25, líneas 1-12.
[43] TPO del 3 de abril de 2018, pág. 19, líneas 8-20; pág. 20, líneas 14-20; TPO del 11 de abril de 2018, pág. 19, líneas 11-23; pág. 20, líneas 1-18.

licenciado Fernández Nadal, quien lo representó en la liquidación de bienes gananciales.[44] Declaró que ese día firmó e inició entre cinco (5) a siete (7) documentos, entre ellos: el pagaré, dos (2) escrituras, el *Truth in Lending Disclosure Statement* y el *Disclosure Settlement.*[45] Señaló que la licenciada Pérez López le expresó que le otorgaría una copia de cada documento, lo que no ocurrió ese mismo día.[46]

Relató que la Sra. Morales Cruz le solicitó que regresara al día siguiente para recoger las copias de los documentos, pero que ello no ocurrió, lo que le causó molestia.[47] Ante ello, expuso que entre el 13 de febrero al 30 abril de 2007, envió cinco (5) cartas a la Junta de Directores de CACSI para exponer su preocupación por no haber recibido los documentos del préstamo.[48] Además, mencionó que el 10 de abril de 2007 se reunió con la Junta de Directores de CACSI para reiterar su reclamo sobre la falta de documentación, por lo que señaló que aún no había realizado pago alguno.[49] Por ello, describió sentirse preocupado y desatendido.[50]

Indicó que el 17 de mayo de 2007 fue citado a CACSI para reestructurar el préstamo, ya que no estaba conforme con ciertos cargos relacionados a unas pólizas, pero que no fue atendido.[51] A raíz de ello, expresó que continuó enviando cartas tanto a la Junta de Directores de CACSI como al presidente ejecutivo de COSSEC, reiterando su indignación para la falta de entrega de los documentos del préstamo.[52] En el contrainterrogatorio, reconoció que solía

---

[44] TPO del 3 de abril de 2018, pág. 20, líneas 9-20.

[45] *Íd.*, pág. 22, líneas 14-22; pág. 23, líneas 1-18; pág. 24, líneas 1-20; TPO del 11 de abril de 2018, pág. 20, líneas 19-23l pág. 21, líneas 1-10.

[46] TPO del 3 de abril de 2018, pág. 23, líneas 5-15.

[47] *Íd.*, pág. 27, líneas 5-15; pág. 28, líneas 20-23.

[48] *Íd.*, pág. 28, líneas 22-23; pág. 48, líneas 23; pág. 1-4; pág. 50, líneas 1-23; pág. 51, líneas 1-23; pág. 52, líneas 1-9; pág. 85, líneas 15-21.

[49] *Íd.*, pág. 86, líneas 5-15.

[50] *Íd.*, líneas 17-21; pág. 88, líneas 3-10.

[51] *Íd.*, pág. 97, líneas 1-8; pág. 100, líneas 1-23; pág. 101, líneas 1-22; pág. 102, líneas 1-22; pág. 103, líneas 1-23; pág. 104, líneas 1-23.

[52] *Íd.*, pág. 103, líneas 3-23; pág. 104, líneas 1-23; pág. 111, líneas 10-18; pág. 111-23; pág. 112, líneas 11-23; pág. 113, líneas 1-23; pág. 114, líneas 1-16; pág. 116, líneas 15-23.

entregar una misma carta en varias ocasiones a CACSI.[53] Mencionó que los únicos documentos que recibió fueron el pagaré hipotecario y una libreta con cupones de pago, los cuales obtuvo entre de mayo a junio de 2007.[54] Precisó que contrató al Lcdo. Lemuel Negrón Colón para que le consiguiera los demás documentos, ya que desconocía el monto exacto a pagar.[55] Ello, debido a que efectuó pagos de $1,500.00, $1,200.00 y $1,078.00.

Asimismo, relató que el 28 de junio de 2007, el presidente de la Junta de Directores de CACSI le remitió una carta para que se presentara a firmar los documentos del préstamo.[56] Puntualizó que en octubre de 2007, participó de la asamblea de CACSI. Alegó que allí le apagaron el micrófono cuando intentó exponer su situación, lo que provocó bochorno y lo llevó a acudir a un psicólogo.[57] Durante, ese período enfrentó otras situaciones personales que le afectaron emocionalmente, tales como problemas económicos derivados de la liquidación de los bienes gananciales y un proceso de quiebra.[58] A su vez, fue demandado por el Sr. José M. Colón Ortiz en cobro de dinero y tuvo un caso criminal por violación a la *Ley para la Prevención e Intervención con la Violencia Doméstica*, Ley Núm. 54 de 15 de agosto de 1989, según enmendada, 8 LPRA sec. 601 *et seq.*[59]

Informó que el 7 de junio de 2007 presentó una *Querella* ante COSSEC, y como resultado, se celebró una vista el 9 de abril de 2008, en la que se instruyó a CACSI que entregara todos los documentos

---

[53] TPO del 21 de junio de 2018, pág. 46, líneas 9-23; pág. 47, líneas 1-23; pág. 55, 6-23; pág. 56, líneas 19.
[54] TPO del 3 de abril de 2018, pág. 117, líneas 9-15; TPO del 11 de abril de 2018, pág. 187, líneas 2-6.
[55] TPO del 3 de abril de 2018, pág. 118, líneas 8-23.
[56] *Íd.*, pág. 135, líneas 1-13; pág. 139, líneas 1-7.
[57] *Íd.*, pág. 153, líneas 13-23; pág. 154, líneas 1-14; pág. 155, líneas 19-22; pág. 156, líneas 1-8; pág. 158, líneas 9-11.
[58] TPO del 21 de junio de 2018, pág. 140, líneas 13-23; pág. 141, líneas 1-23; pág. 142, líneas 1-23; pág. 143, líneas 1-23; pág. 144, líneas 1-16; pág. 145, líneas 1-19.
[59] *Íd.*, pág. 162, líneas 18-23; pág. 163, líneas 1-7; pág. 178, líneas 16-22; pág. 179, líneas 1-23; pág. 180, líneas 1-23; pág. 181, líneas 1-22; pág. 182, líneas 1-22.

del préstamo.[60] Al no obtenerlos, declaró que contrató al Lcdo. Martín González.[61] Indicó que con la ayuda de este abogado, notó que la firma en el pagaré no era la suya y que no fue identificado mediante su licencia de conducir, a pesar de que la notario anotó su número de licencia.[62] Explicó que no se percató de ello anteriormente, ya que dejó los documentos en el sobre tal como se los entregaron.[63] Expresó que el Lcdo. Martín González logró obtener el expediente del préstamo, incluyendo el *Truth and Lending Disclosure Statement*, en el cual observó discrepancias en el término del préstamo, las cantidades eran excesivas y ausencia de su firma.[64] Ante ello, atestó que contrató al calígrafo Pedro A. Figueroa González y al contable Edwin Maldonado Nazario.[65]

El apelado expresó que no podía precisar si leyó algún documento que firmó el 6 de septiembre de 2006.[66] Además, admitió que no leyó los documentos que firmó el 31 de enero de 2007, incluyendo el pagaré.[67] No identificó las iniciales ni las firmas de los documentos como suyas, ya que expresó que dudaba de todo el proceso, aunque reconoció que pudo haber suscrito uno de ellos.[68] También, señaló que no recordaba si firmó un contrato de prenda el día del cierre, aunque aceptó pudo haber firmado uno sin leerlo.

---

[60] TPO del 3 de abril de 2018, pág. 119, líneas 17-23; pág. 120, líneas 1-22; pág. 121, líneas 1-10; pág. 169, líneas 1-23; pág, 170, líneas 1-23; pág. 171, líneas 1-20; pág. 196, líneas 7-22; pág. 197, líneas 1-23; pág. 202, líneas 1-18; pág. 205, líneas 1-22.

[61] *Íd.*, pág. 119, líneas 17-23.

[62] *Íd.*, pág. 207, líneas 1-19.

[63] *Íd.*, pág. 208, líneas 14-18.

[64] *Íd.*, pág. 209, líneas 1-16; TPO del 11 de abril de 2018, pág. 255, líneas 15-23; pág. 256, líneas 1-7.

[65] TPO del 3 de abril de 2018, líneas 17-22; pág. 210, líneas 1-23; pág. 211, línea 1-18; pág. 212, líneas 1-23; pág. 213, líneas 1-13.

[66] TPO del 11 de abril de 2018, pág. 43, líneas 1-22; pág. 170, líneas 6-23; pág. 171, líneas 1-6.

[67] *Íd.*, pág. 125, líneas 1-4; pág. 128, líneas 13-15; pág. 169, líneas 21-23; pág. 170, líneas 1-3; pág. 171, líneas 7-8.

[68] *Íd.*, pág. 83, líneas 1-23; pág. 17-23; pág. 99, líneas 5-23; pág. 103, líneas 14-21; pág. 103, líneas 14-21; pág. 108, líneas 13-16; pág. 110, líneas 11-17; pág. 130, líneas 17-20.

Aseguró que el Sr. Edwin Rodríguez Colón, quien figuraba como firmante, no estuvo presente.[69]

Expresó que pagó el préstamo por alrededor de tres (3) años, desde marzo de 2007 hasta 2009 o 2010, aunque se acogió a la quiebra el 11 de enero de 2008, incluyendo a CACSI como acreedor.[70]

**Pedro A. Figueroa González**

El testigo declaró que llevaba treinta y cinco (35) años como perito calígrafo y en huellas digitales.[71] Indicó que el señor Dedós Colón lo contrató para examinar unas copias de documentos dudosos que le suministró relacionados a un pagaré.[72] Indicó que, basado en el examen pericial de veinticuatro (24) factores de identificación de los documentos, preparó un Informe Pericial y un Informe Final.[73] Expresó que encontró diferencias en el espacio de las iniciales del apelado en el pagaré y en la escritura en comparación con otros documentos.[74] Planteó que la firma aparentaba ser retocada por la diferencia en la presión muscular reflejada en el exceso de tinta, por lo que concluyó que era una burda imitación.[75] Señaló que la letra "D" de Dedós en el pagaré se trazó diagonalmente como una "C", lo cual no ocurrió en sus firmas utilizadas para la comparación.[76]

Sin embargo, admitió que no revisó la escritura de hipoteca que se firmó el mismo día del pagaré.[77] También, reconoció que desconocía cuántos documentos el señor Dedós Colón firmó esa fecha.[78] Además, respondió que en su análisis no contempló los

---

[69] *Íd.*, pág. 168, líneas 1-22; pág. 169, líneas 1-20.
[70] TPO del 21 de junio de 2018, pág. 133, líneas 1-23; pág. 134, líneas 1-22; pág. 136, líneas 1-22; pág. 137, líneas 1-22; pág. 138, líneas 1-7.
[71] *Íd.*, pág. 315, líneas 1-4.
[72] *Íd.*, pág. 323, líneas 7-16; pág. 357, líneas 13-18; TPO del 22 de junio de 2018, pág. 122, líneas 1-8; TPO del 22 de junio de 2018, pág. 209, líneas 16-22; pág. 210, líneas 1-13; pág. 212, líneas 18-23; pág. 213, líneas 1-3.
[73] TPO del 22 de junio de 2018, pág. 131, líneas 18-21; pág. 133, líneas 9-12; pág. 134, líneas 3-23; pág. 153, líneas 10-19; pág. 162, líneas 4-19.
[74] *Íd.*, pág. 176, líneas 12-16; pág. 178, líneas 7-15; pág. 187, líneas 4-18.
[75] *Íd.*, pág. 179, líneas 12-22; pág. 180, líneas 1-17; pág. 181, líneas 21-22; pág. 182, líneas 1-23; pág. 196, líneas 11-23; pág. 197, líneas 1-3.
[76] *Íd.*, pág. 183, líneas 2-21; pág. 184, líneas 1-22.
[77] *Íd.*, pág. 224, líneas 18-22; pág. 225, líneas 1-5.
[78] *Íd.*, pág. 225, líneas 6-12.

diferentes instrumentos de escritura que pudo utilizar.[79] Asimismo, aceptó que existían variaciones normales en distintas firmas de una persona.[80]

**Edwin Maldonado Nazario**

El testigo declaró que comenzó su amistad con el señor Dedós Colón alrededor del 2004 o 2005, desde que comenzó a brindarle sus servicios de contabilidad.[81] Expresó que dado el vínculo de confianza, el apelado le expuso la situación de la hipoteca, por lo que se ofreció a un examinar Estimado de Buena Fe y un *Truth in Lending Disclosure Statement*.[82] Atestó que detectó discrepancias en las fechas de origen y final, más en el importe mensual.[83]

**Rafael Viñas Torres**

El testigo declaró que era examinador de documentos dudosos.[84] Expresó que el señor Dedós Colón lo contrató y visitó a CACSI para fotografiar una serie de documentos originales.[85] No obstante, expresó que no mantuvo más contacto con el apelado, ya que no lograron un acuerdo respecto a sus honorarios.[86]

**Carlos Fernández Nadal**

El abogado-notario testificó que conocía al señor Dedós Colón por haberlo representado en la liquidación de la sociedad legal de gananciales, en la adquisición del inmueble donde estableció su barbería y en unos alquileres.[87] Indicó que entregó los documentos del señor Dedós Colón a la notario para que preparara la escritura de constitución de la hipoteca y la de liquidación de bienes gananciales.[88] Precisó que, al igual que el apelado, no tuvo reparo en

---

[79] *Íd.*, pág. 230, líneas 22-23; pág. 231, líneas 1-6.
[80] *Íd.*, pág. 230, líneas 12-16;
[81] *Íd.*, pág. 30, líneas 7-19.
[82] *Íd.*, pág. 30, líneas 9-22; pág. 31, líneas 1-8.
[83] *Íd.*, pág. 82, líneas 14-22; pág. 83, líneas 1-21.
[84] TPO del 13 de julio de 2018, pág. 109, líneas 9-14.
[85] *Íd.*, pág. 112, líneas 12-23; pág. 114, líneas 20-23.
[86] *Íd.*, pág. 115, líneas 4-17.
[87] *Íd.*, pág. 146, líneas 14-23; pág. 147, líneas 1-14.
[88] *Íd.*, pág. 149, líneas 3-23; pág. 150, líneas 1-23; pág. 151, líneas 1-15.

que se le proveyera la identificación, ya que la notario no lo conocía personalmente.[89]

**Evaristo Álvarez Ghigliotti**

El testigo se dedicaba a examinar documentos dudosos.[90] Testificó que preparó un Informe Pericial basado en la evaluación de los documentos originales provistos por CACSI y la licenciada Pérez López, incluyendo el pagaré hipotecario original y las muestras de firma del señor Dedós Colón tomadas en el 2007.[91] Indicó que encontró similitud en las características, proporciones y movimientos de escritura en la firma dubitada y en la conocida del señor Dedós Colón, aunque observó algunas variaciones atribuibles a su destreza media y baja por no firmar con frecuencia debido a la naturaleza no ejecutiva de su empleo.[92] Concluyó que el apelado suscribió tanto el pagaré como los documentos que contenían su firma conocida, ya que era su firma natural en término de los trazos.[93]

Tras la celebración del juicio, el 16 de septiembre de 2022, el TPI emitió su *Sentencia*.[94] El Foro *a quo* determinó que CACSI incumplió múltiples disposiciones legales, tanto locales como federales, en la tramitación del préstamo del señor Dedós Colón. En particular, concluyó que infringió la TILA, *supra*, al omitir información requerida por ley y añadir cargos innecesarios sin el consentimiento ni conocimiento del apelado. Señaló que dicho estatuto federal exigía que el acreedor informara con precisión los costos y las tarifas del préstamo. No obstante, determinó que CACSI no entregó la documentación sino hasta dos (2) años después.

---

[89] *Íd.*, pág. 151, líneas 16-23.
[90] *Íd.*, pág. 173, líneas 11-14.
[91] TPO del 6 de septiembre de 2018, pág. 29, líneas 12-23; pág. 30, líneas 1-17; pág. 31, líneas 14-23; pág. 10-22; pág. 106, líneas 1-14.
[92] *Íd.*, pág. 75, líneas 22-23; pág. 76, líneas 1-23; pág. 77, líneas 1-4; pág. 78, líneas 1-21; pág. 154, líneas 16-19; pág. 155, líneas 11-23; pág. 156, líneas 1-9.
[93] *Íd.*, pág. 85, líneas 8-23; pág. 86, líneas 1-3.
[94] Apéndice de *Apelación*, Anejo 9, págs. 614-659.

El Tribunal *a quo* también atribuyó responsabilidad a CACSI por las actuaciones de sus empleados, incluyendo la alegada imitación de la firma del apelado en el pagaré; la solicitud final del préstamo; el aviso de no aceptación de seguro de vida; el *Initial Escrow Account Disclosure Statement,* y la Hoja de Información para Seguros de Propiedad. Añadió que los funcionarios de CACSI que participaron en la tramitación del préstamo violaron su deber fiduciario al incluir partidas falsas, superfluas, irrazonables y contrarias a la ley, además de variar ilegal y unilateralmente la solicitud del préstamo. Específicamente, apuntó que hubo discrepancias en el término del préstamo en el *Truth in Lending Disclosure Statement* y en el *Settlement Statement,* entre ciento ochenta (180) y trescientos sesenta (360) meses.

De otra parte, el Tribunal *a quo* consignó que otra irregularidad consistió en que la licenciada Pérez López consignó en la Escritura Núm. 5 que conocía al apelado, cuando no se permitía identificarlo de tal manera al otorgarse la Escritura Núm. 4 en igual fecha.

Además, concluyó que CACSI no logró probar mediante la mejor evidencia que los cheques para cancelar las deudas del señor Dedós Colón fueron cobrados por sus acreedores. Ello, dado que la representación legal del apelado alegó que la institución financiera no produjo los cheques cancelados, aunque la Sra. Morales Cruz testificó que la copia de los cheques originales tenía la palabra *void.*

En cuanto a la existencia de la deuda, el TPI indicó que CACSI produjo una certificación de deuda calculando un balance de principal, intereses y honorarios de abogado. Precisó que se marcó como prueba ofrecida y no admitida, por lo que no se presentó evidencia sobre la existencia de una deuda líquida, vencida y exigible.

El TPI determinó que CACSI incurrió en negligencia al tramitar el préstamo personal del apelado e incumplir con los formularios mandatorios, requeridos en las prácticas de otras instituciones

financieras, las cuales son reconocidas como sanas y en protección del interés público. Ante ello, declaró No Ha Lugar a la *Demanda* y Con Lugar a la *Reconvención.* Además, determinó que el apelado sufrió daños económicos y emocionales como secuela del fraude, por lo que le concedió $75,000.00 por concepto de daños económicos y $50,000.00 por angustias mentales.

Según el TPI, CACSI incurrió en temeridad al insistir en cobrar un préstamo en el que se cometió fraude al alterar la firma del apelado, y al no presentar prueba sobre la cantidad del préstamo y que ésta fuera líquida y exigible.

Inconforme, el 19 de octubre de 2022, CACSI presentó una *Solicitud de Reconsideración y Solicitud de Enmiendas o Determinaciones Adicionales de Hechos y Conclusiones de Derecho.*[95] En resumen, indicó que la *Sentencia* que el TPI emitió era contraria a los hechos y a la prueba admitida y estipulada por las partes. Con respecto a la falsificación del pagaré hipotecario, precisó que se firmó en presencia de tres (3) notarios cuya credibilidad no se impugnó ni se controvirtió en el juicio. Expuso que el TPI ignoró el peso probatorio de la fe notarial de la licenciada Pérez López, así como la existencia de un pagaré idéntico en el protocolo notarial que se presentó en el juicio y que fue estipulado por ambas partes. Manifestó que el peso probatorio de la dación de fe que el Estado depositó en la notario era evidencia de peso mayor que el testimonio del señor Figueroa González, un perito autodidacta que solamente evaluó el pagaré y no examinó otros documentos. Más aún, arguyó que permitir que el señor Dedós Colón retuviera el dinero desembolsado constituiría un enriquecimiento injusto, sumado a que se le adjudicó $75,000.00 en daños económicos y $50,000.00 por angustias mentales.

---

[95] *Íd.*, Anejo 10, págs. 660-688.

Así las cosas, el 16 de julio de 2024 el Foro *a quo* emitió una *Resolución* en la que declaró No Ha Lugar a la solicitud de reconsideración de la apelante.[96]

En desacuerdo con la determinación, el 16 de agosto de 2024, CACSI presentó este recurso de apelación, en el que planteó que el TPI incidió en los siguientes errores:

**PRIMER ERROR:** HUBO ERROR MANIFIESTO Y ABUSO DE DISCRECIÓN DEL TPI, AL NO PERMITIR QUE CACSI CULMINARA CON LA PRESENTACIÓN DE SU CASO EN SU TURNO DE PRUEBA (DIRECTO), ADOPTANDO EL TPI, 244 DETERMINACIONES DE HECHOS, EN LAS CUALES APRECIÓ LA PRUEBA SIN EL BENEFICIO DE UNA PRUEBA QUE ENTIENDE CACSI ERA MEDULAR EN SU CASO. LA PRUEBA MEDULAR EXCLUIDA DE FORMA PERJUDICIAL EN EL COBRO DE DINERO Y EJECUCIÓN DE HIPOTECA, ERA QUE EL ADEUDO ERA UNA OBLIGACIÓN VENCIDA, LÍQUIDA Y EXIGIBLE.

**SEGUNDO ERROR:** ERRÓ EL TPI AL IMPONER HONORARIOS POR TEMERIDAD, EN UNA ACCIÓN DE COBRO DE DINERO Y EJECUCIÓN DE HIPOTECA POR LA VÍA ORDINARIA, POR NO HABERSE PROBADO EL CASO.

**TERCER ERROR:** HUBO ERROR MANIFIESTO DEL TPI EN LA DETERMINACIÓN DEL HECHO NÚMERO 175 DE LA SENTENCIA, PÁGINAS 19-20 […] AL HACER UNA DETERMINACIÓN DE HECHO, SOBRE UNA PRUEBA QUE NUNCA DESFILÓ EN EL JUICIO, TAL ERROR TIENE COMO FIN MELLAR LA CREDIBILIDAD DEL PERITO CALÍGRAFO, SR. EVARISTO ÁLVAREZ, PERITO DE LA PARTE DEMANDANTE. AL INDICAR DE FORMA FALSA LO SIGUIENTE:

"175. A PESAR DE ESTO CON POSTERIORIDAD EN EL CONTRAINTERROGATORIO DE LA PARTE DEMANDADA SALIÓ A RELUCIR QUE EL PERITO EVARISTO ÁLVAREZ [GHIGLIOTTI] DIO INFORMACIÓN INCORRECTA EN CUANTO A SU PREPARACIÓN[,] EXPERIENCIA E INTERVENCIÓN EN PLEITOS JUDICIALES COMO PERITO CALÍGRAFO. EL PERITO TESTIFICÓ BAJO JURAMENTO QUE TRABAJÓ PARA EL FBI, SIN EMBARGO, ESTO NO ERA CORRECTO. TAMBIÉN EL PERITO CALÍGRAFO OMITIÓ INFORMACIÓN SOBRE SU INTERVENCIÓN Y DESCALIFICACIÓN COMO PERITO EN PLEITOS JUDICIALES ANTERIORES. AUNQUE ESTO NO FUE SUFICIENTE PARA DESCALIFICARLO COMO PERITO, CIERTAMENTE MELLA SU CREDIBILIDAD".

**CUARTO ERROR:** ERRÓ EL TPI EN LA APRECIACIÓN DE LA PRUEBA DEL PERITO CALÍGRAFO DEL DEMANDADO, SR. PEDRO A. FIGUEROA […] Y ADOPTAR SUS CONCLUSIONES EN LA SENTENCIA, QUE CONTRADICEN LAS DETERMINACIONES DE HECHO DE LA SENTENCIA. VEAMOS LA PÁGINA 43, ÚLTIMO PÁRRAFO, DE LA SENTENCIA […] LO SIGUIENTE:

---

[96] *Íd.*, Anejo 11, págs. 689-712.

"SIN PODER DETERMINAR ESPECÍFICAMENTE LA PERSONA NATURAL QUE TRAT[Ó] DE IMITAR LA FIRMA DEL SR. DEDÓS COLÓN EN EL DOCUMENTO (PAGARÉ) DEL PRÉSTAMO, LA PERSONA JURÍDICA AQUÍ DEMANDANTE ES RESPONSABLE DE LA ACTUACIÓN DE SUS EMPLEADOS, DE LAS ACCIONES REALIZADAS DENTRO DE LA [CACSI], EN EL DESEMPEÑO DE LAS FUNCIONES DE ESTOS. TAMBIÉN SE ALTERÓ LA FIRMA EN LA SOLICITUD FINAL DEL PRÉSTAMO, EL AVISO DE NO ACEPTACIÓN DE SEGURO DE VIDA, EL INITIAL ESCROW ACCOUNT DISCLOSURE STATEMENTS Y LA HOJA DE INFORMACIÓN PARA SEGUROS DE PROPIEDAD".

**QUINTO ERROR:** ERRÓ EL TPI AL DECLARAR CON LUGAR LA RECONVENCIÓN. CUANDO EN LA PÁGINA 44, DE LA SENTENCIA, ÚLTIMO PÁRRAFO [...], EL TPI DETERMINÓ ERRÓNEAMENTE:

"ADEMÁS, POR LAS ACCIONES DE [CACSI], AL INSISTIR EN COBRAR LA CANTIDAD DE UN PRÉSTAMO QUE SE TRAMITÓ DE FORMA IRREGULAR Y EN EL QUE SE COMETIÓ FRAUDE AL ALTERAR LA FIRMA DEL DEMANDADO EN LOS DOCUMENTOS RELACIONADOS AL PRÉSTAMO Y POR NO PRESENTAR LA PRUEBA SOBRE LA CANTIDAD DEL PRÉSTAMO Y SU CONDICIÓN DE CANTIDAD LÍQUIDA Y EXIGIBLE SE DETERMINA QUE EL DEMANDANTE INCURRIÓ EN TEMERIDAD".

**SEXTO ERROR:** ERRÓ EL TPI AL OMITIR EN LA SENTENCIA, QUÉ VA A SUCEDER CON EL CONTRATO DE PRÉSTAMO Y LA OBLIGACIÓN SUBSIDIARIA QUE ES LA HIPOTECA EN GARANTÍA DE PAGARÉ. LA INTERROGANTE, [¿QUÉ] PASA CON LAS CONTRAPRESTACIONES?

**SÉPTIMO ERROR:** ERRÓ EL TPI EN CUANTO A TODOS LOS DAÑOS. SE DIERON DAÑOS ECONÓMICOS POR LA SUMA DE $75,000.00, SIN HABER NINGUNA EVIDENCIA EN EL RÉCORD O UNA DETERMINACIÓN DE HECHO EN LA CUAL SE DESGLOSAN TALES DAÑOS ECONÓMICOS, TAMPOCO EXISTE UN INFORME PERICIAL DE DAÑOS ECONÓMICOS, ESO HAY QUE PROBARLO, ESE DAÑO ESPECIAL NO ESTÁ SOSTENIDO EN LA PRUEBA DESFILADA. LOS DAÑOS ECONÓMICOS, NO PUEDEN SER ESPECULATIVOS. EN CUANTO A LOS DAÑOS EMOCIONALES SE OTORGARON $50,000.00, SIN APLICARSE LA DOCTRINA DE LA VALORACIÓN DE LOS DAÑOS Y EL CASO SANTIAGO MONTAÑEZ [V.] FRESENIUS, 195 DPR 476 (2016). MÁS AUN, LA PRUEBA DE LA PARTE DEMANDANTE PARA PROBAR SU ACREENCIA (CERTIFICADO DE DEUDA) FUE EXCLUIDA.

**OCTAVO ERROR:** NO HUBO CAUSA TORPE QUE ANULARA EL VICIO DE CONSENTIMIENTO. A LO SUMO ERRORES CLERICALES, QUE DAN LUGAR A SU CORRECCIÓN.

Respecto al primer y segundo error, la apelante argumentó que el TPI recesó los trabajos del día previo a presentar la prueba del adeudo, específicamente la certificación de deuda al día, pero no permitió que se continuara con el trámite para su admisibilidad en el próximo señalamiento. Indicó que cuando su representante legal intentó proseguir con el interrogatorio directo, el tribunal sostuvo que

culminó la presentación de su caso, por lo que no le permitió presentar el balance de la deuda para probar que la misma estaba vencida, además de que era líquida y exigible. Ante ello, señaló que solicitó que su certificación de deuda se marcara como prueba ofrecida y no admitida. Planteó que la exclusión de esta prueba medular tuvo como consecuencia que el TPI declarara No Ha Lugar a su causa de acción de cobro de dinero y le impusiera el pago de honorarios por temeridad, daños emocionales y económicos. La apelada añadió el siguiente fragmento de la TPO del 9 de marzo de 2018:

> [Prepresentante legal]: Como, como está contingente la cuestión de admitir como Exhibit la certificación de la deuda, sabemos que está en estos papeles, pero de momento no lo, no lo tengo para ...
> [Jueza]: Bueno, pues lo dejamos para el próximo día.
> [Representante legal]: Sí, son las 4:51.
> [Jueza]: Que estamos hablando de abril 2 a las 9:00 de la mañana, lunes.
> [...]
> [Jueza]: Y usted tendría que estar de nuevo señora Morales.

Sobre el tercer error señalado, CACSI arguyó que, contrario a lo expuesto por el TPI en la determinación de hecho núm. 175,[97] el perito Álvarez Ghigliotti nunca afirmó ser empleado del *Federal Bureau of Investigation* (FBI), sino que recibió adiestramiento de esa agencia. La apelante esgrimió que el TPI excluyó parte de la prueba para dar una impresión de incorrección. Apoyó su alegación con el siguiente extracto de la TPO:

> [Sr. Álvarez Ghigliotti]: Yo cogí el curso en el FBI.
> [Representante legal]: Cogió el curso, no era Agente en el FBI, ¿verdad?
> [Sr. Álvarez Ghigliotti]: No, no.

---

[97] Determinación de hecho núm 175:
> A pesar de esto con posterioridad en el contrainterrogatorio de la parte demandada salió a relucir que el perito Evaristo Álvarez [Ghigliotti] dio información incorrecta en cuanto a su preparación, experiencia e intervención en pleitos judiciales como perito calígrafo. El perito testificó bajo juramento que trabajó para el FBI, sin embargo, esto no era correcto. También[,] el perito calígrafo omitió información sobre su intervención y descalificación como perito en pleitos judiciales anteriores. Aunque esto no fue suficiente para descalificarlo como perito, ciertamente mella su credibilidad.

En relación con el cuarto señalamiento de error, cuestionó que el TPI adoptó como válidas las conclusiones del Perito Figueroa González e ignoró la fe notarial de la licenciada Pérez López. Además, recalcó que el TPI incidió al concluir que una persona natural imitó la firma del señor Dedós Colón, máxime que estipuló el pagaré. Al respecto, planteó que dicha parte no iba a estipular el documento, a sabiendas de que no lo firmó.

Referente al quinto error, el apelante sostuvo que el TPI incidió al declarar Con Lugar a la *Reconvención* del apelado, cuando tal decisión contradecía la determinación de hecho núm. 52 de la *Sentencia* apelada,[98] en la que se consignó que el apelado firmó el *Disclosure Statement*, el pagaré hipotecario, la escritura de constitución de hipoteca y la escritura de liquidación de la SLG ante la licenciada Pérez López.

En lo concerniente al sexto señalamiento de error, CACSI expresó que el Foro Primario erró al no atender el destino de las contraprestaciones recibidas por el señor Dedós Colón para liquidar la SLG, pagar sus acreedores, liquidar una hipoteca previa que tenía con CACSI y un sobrante a su nombre. Planteó que ello constituyó enriquecimiento injusto. Alegó que, en ausencia de prueba de dolo grave, el contrato de préstamo hipotecario no se podía resolver sin que se ordenara la devolución del dinero prestado.

En cuanto al séptimo señalamiento de error, precisó que no existió prueba suficiente para sustentar la concesión de daños económicos y angustias mentales, ya que no se presentaron peritos ni prueba específica sobre los daños detallados. Además, argumentó

---

[98] Determinación de hecho núm. 52:

> [El] Sr. Dedós Colón firmó el *Disclosure Statement*, Pagaré Hipotecario, Escritura de Constitución de [Pagaré] Hipotecario, Escritura de Liquidación de la Sociedad Legal de Bienes Gananciales, Escritura de Hipoteca, ante la notario, Katiria Pérez. No hay discusión que estos documentos fueron firmados por el Sr. Dedós Colón[.]

que el TPI omitió detallar el cómputo utilizado para las cuantías concedidas por daños.

Por último, como octavo error, CACSI arguyó que no existió causa torpe que anulara el consentimiento del señor Dedós Colón. En cuanto a su alegación de que el término del préstamo en el *Truth in Lending Disclosure Statement* era distinto al *Settlement Statement,* la apelante sostuvo que dicho planteamiento era infundado, ya que este último documento no contenía un renglón donde se indicara el término en años del préstamo. Además, CACSI argumentó que aunque el *Truth in Lending Disclosure Statement* establecía incorrectamente "15 YR COMMERCIAL FXD RATE/TERM", el propio documento especificaba que el término del préstamo era de trescientos sesenta (360) meses. Se sustentó en que eran trescientos cincuenta y nueve (359) pagos mensuales de $1,029.92 comenzando el 1 de marzo de 2007 y un último pago de $1,025.22. Señaló que el pagaré indicaba que el principal y los intereses eran pagaderos en trescientos sesenta (360) plazos mensuales. Asimismo, precisó que en los *Uniform Residential Loan Application* del 6 de septiembre de 2006 y del 31 de enero de 2007, se consignó que el préstamo solicitado por el señor Dedós Colón era a un término de trescientos sesenta (360) meses. También, se refirió a una carta de su vicepresidente dirigida a la Junta de Directores, en la que se expresó que se solicitó un préstamo por $128,000.00, a un término de trescientos sesenta (360) meses y con un interés anual de 9.00%.

Con respecto a la alegación del apelado de una incongruencia entre la fecha de comienzo y de finalización del préstamo, CACSI planteó que en todos los documentos, incluyendo el *First Payment Letter,* surgió que los pagos comenzarían el 1 de marzo de 2007 y culminarían el 1 de febrero de 2037. Ello, con excepción de un error en el pagaré hipotecario en el que indicó que la fecha de comienzo de pago era el 1 de febrero de 2007.

En lo atinente al tercer señalamiento del apelado sobre la tabla de amortización, CACSI aclaró que esta se preparó correctamente a trescientos sesenta (360) meses y no a ciento ochenta (180) meses, de acuerdo con los términos del préstamo.

En cuanto al cuarto cuestionamiento del señor Dedós Colón relativo a la asignación de $9,000.00 para mejoras reflejadas en el *Truth in Lending Disclosure Statement*, la apelante planteó que a la fecha del cierre, el préstamo se aprobó sin retener dicha cantidad. Por ello, explicó que no apareció como partida desglosada en el *Settlement Statement*. Sin embargo, precisó que la cantidad a financiar de $122,848.44 no se alteró y que, en vez de retener los $9,000.00 de mejora, se desembolsó al apelado la totalidad de $18,854.26.

En torno al quinto cuestionamiento sobre el pago de seguro, CACSI indicó que, según el *Settlement Statement*, se retuvieron $4,183.00 para la prima del primer año del seguro de inundación y $697.16, equivalente a dos (2) meses de reserva del seguro de inundación, para un total de $4,880.16. No obstante, posteriormente, la Cooperativa de Seguros Múltiples de Puerto Rico ajustó la prima a $1,220.00 anuales tras el señor Dedós Colón presentar documentación adicional posterior al cierre del préstamo. Sin embargo, el exceso de la prima pagada fue devuelto al apelado. Asimismo, planteó que le reembolsó $1,335.00, correspondientes al exceso de prima retenida al cierre del préstamo y a los seguros de propiedad e inundación.

Respecto al sexto cuestionamiento del apelado sobre la falta de revisión de documentos, CACSI respondió que siempre estuvieron a su disposición en su oficina. Especificó que el señor Dedós Colón revisó y sacó copia de su expediente el 13 de julio de 2009 y lo volvió a revisar el 28 de agosto de ese mismo año. Precisó que en septiembre de 2009, se le enviaron los documentos solicitados y, el 2 de octubre de 2009, se le remitió por fax el *Truth in Lending Disclosure Statement*.

Como el apelado no quedó conforme con la copia, la Lcda. Lydia María Rodríguez Colón recogió personalmente el documento.

En torno al séptimo cuestionamiento relacionado al cobro de $100.00 por el cambio de nombre de la propiedad, la apelante indicó que respondía a los gastos legales por el procesamiento de la Planilla Informativa Sobre Segregación, Agrupación o Traslado de Bienes inmuebles ante el Departamento de Hacienda, y la solicitud de cambio de dueño en el CRIM.

En relación con el noveno señalamiento del señor Dedós Colón sobre el estudio de elevación, CACSI sostuvo que el Certificado de Elevación era un requisito del Programa del Seguro Nacional de Inundación administrado por la Agencia Federal de Manejo de Emergencias (FEMA) para aquella propiedad construida en o después del 1 de agosto de 1978 y ubicada en zonas A-1-30, AE, A, V1-30, VE y V. La apelante señaló que el Certificado de Elevación era necesario, ya que el apelado indicó en la solicitud de préstamo del 6 de septiembre de 2006 que la propiedad objeto de la hipoteca se construyó en el 1992 y se encontraba ubicada en una zona AE.

Finalmente, CACSI explicó que, debido a que el cierre del préstamo concluyó pasadas las 10:00 de la noche y la impresora tuvo desperfecto, las partes acordaron que el señor Dedós Colón pasaría el día siguiente a firmar la Solicitud Final, el Aviso de No Aceptación del Seguro de Vida, el *Initial Escrow Account Disclosure Statement* y el *Truth in Lending Disclosure Statement*. No obstante, alegó que, pese a múltiples solicitudes, el apelado se negó a firmarlos.

Por su parte, el 18 de marzo de 2025, el señor Dedós Colón presentó una *Solicitud de Desestimación por Falta de Jurisdicción y/o Alegato de la Parte Apelada*. Preliminarmente, solicitó la desestimación de este recurso al entender que la apelante no incluyó el volante de notificación de la *Sentencia* del TPI del 16 de septiembre de 2022 ni la solicitud de reconsideración del 19 de octubre de 2022.

Con relación al primer señalamiento de error, el apelado sostuvo que el TPI no denegó la admisión de la certificación de deuda únicamente por los fundamentos señalados por CACSI. Explicó que el 9 de marzo de 2018 concluyó el interrogatorio directo de la funcionaria de la CACSI sin que indicara el monto de la deuda, ya que no tenía consigo el documento. Además, manifestó que el representante legal de la apelante no presentó el documento para su autenticación. Añadió que, en la vista del 2 de abril de 2018, el TPI expresó que no encontró en el expediente la certificación de deuda, a pesar de que dicha parte alegó haber producido varias certificaciones recientes o que se podía computar desde el pagaré. Ante tal alegación, el señor Dedós Colón precisó que el TPI reiteró que a CACSI le correspondía presentar la prueba de la deuda y que no era responsabilidad del apelado ni del Tribunal calcularlo. Asimismo, observó que la certificación de deuda estaba fechada 29 de marzo de 2018 cuando la señora. Morales Cruz testificó el 9 de marzo de 2018. Por ello, argumentó que CACSI no cumplió su carga probatoria.

En lo atinente al segundo, quinto y octavo señalamiento de error, el apelado defendió la decisión del TPI de no reabrir el interrogatorio de la señora Morales Cruz. Por esto, afirmó que la *Reconvención* fue declarada Con Lugar en base a la prueba presentada, la cual no fue impugnada por la apelante. Ello, en vista de que el Foro Primario resolvió que el señor Dedós Colón no firmó el *Uniform Residential Loan Application* de 31 de enero de 2007, a pesar de que el documento debía firmarlo y entregarlo en el momento del cierre. Asimismo, el apelado planteó que el TPI determinó que el presidente de la Junta de Directores de CACSI le solicitó firmar todos los documentos del préstamo posterior, sin explicar las razones por las que no fueron entregados al momento del cierre.

El apelado precisó que el Foro *a quo* resolvió que CACSI le cobró una póliza de $4,358.00, cuando en realidad debía pagar $1,220.00,

por lo que COSSEC ordenó la devolución de $3,512.00. A su vez, adujo que el TPI concluyó que los funcionarios de CACSI incumplieron sus deberes fiduciarios al incluir partidas falsas, superfluas, irrazonables y contrarias a derecho. También estableció que el *Truth in Lending Disclosure Statement* no contenía la suma de $9,000 para unos costos de mejoras y que no concordaba con el *Settlement Statement*. Además, concluyó que CACSI incumplió con la TILA, *supra*, al omitir información esencial como el monto total del préstamo, la tasa de interés anual, los costos de la solicitud, las penalidades y los cargos por demora, el itinerario de pagos y el total acumulado durante la vigencia del préstamo. Igualmente, arguyó que se incluyeron gastos innecesarios sin su conocimiento ni consentimiento, y que existían errores en cuanto al término del préstamo, el comienzo del pago y otros gastos.

De igual forma, precisó que el TPI concluyó que CACSI cometió fraude al alterar su firma en el pagaré, lo que provocó su nulidad por tratarse de un contrato sin causa que no produjo efecto. En consonancia con lo anterior, manifestó que el Foro apelado determinó correctamente que la apelante incurrió en temeridad al intentar cobrar un préstamo que se tramitó de forma irregular y fraudulenta.

En lo relativo al tercer señalamiento de error, el apelado argumentó que el perito Sr. Álvarez Ghigliotti intervino en un caso previo en el que se determinó que la reclamación era frívola y un intento de utilizar el sistema judicial para convalidar fraude. Alegó que esa determinación afectó la credibilidad del perito en el presente caso y fue un factor determinante para el Foro *a quo* descartar su testimonio. En torno al cuarto planteamiento de error, señaló que CACSI no analizó los informes periciales, las declaraciones de los peritos ni explicó en qué erró el TPI al descartar el informe del perito Álvarez Ghigliotti ni al resolver sobre la validez del pagaré.

En relación con el sexto señalamiento de error, el señor Dedós Colón planteó que CACSI no logró establecer la existencia de una deuda, razón por la cual la *Demanda* se declaró No Ha Lugar. Por tanto, consideró improcedente la alegación de enriquecimiento injusto, principalmente cuando el pagaré se declaró nulo por la falsificación de firma. Como resultado, sostuvo que la hipoteca también era nula e ineficaz, y que no procedía una reclamación en su contra. Finalmente, por lo que respecta al séptimo error, el apelado defendió las cuantías concedidas en concepto de daños. Sostuvo que estas estaban debidamente fundamentadas en la valoración de la prueba por parte del TPI, por lo que este Tribunal debía otorgarle deferencia y abstenerse de intervenir con dicha determinación.

El 31 de marzo de 2025, CACSI presentó una *Moción en Oposición a Desestimación por Falta de Jurisdicción*. En síntesis, adujo que la apelación se presentó dentro del término jurisdiccional, en vista de que el señor Dedós Colón omitió expresar que la apelante presentó una solicitud de reconsideración, la cual tuvo el efecto de extender los términos apelativos.

En atención a los planteamientos de error, pormenorizamos la normativa jurídica pertinente a este recurso.

## II.

### A. Apreciación de la prueba

Este Tribunal de Apelaciones tiene como función esencial actuar como foro revisor. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). En cumplimiento de esa función, nos corresponde examinar si el tribunal inferior aplicó correctamente el derecho a los hechos particulares del caso. *Íd.* Para ello, es indispensable que el Foro Primario desarrolle un expediente completo, con determinaciones de hechos sustentadas en la prueba desfilada. *Íd.* A diferencia del foro de instancia, los tribunales apelativos no celebramos juicios plenarios, no presenciamos el testimonio oral de

los testigos, no dirimimos la credibilidad ni formulamos determinaciones de hechos. *Íd.*

No obstante, cuando se trata de prueba documental, pericial o testimonial ofrecida mediante declaraciones escritas, este foro revisor se encuentra en la misma posición que el Tribunal de Primera Instancia. *Ortiz et al. v. SLG Meaux*, 156 DPR 488, 495 (2002). En este sentido, este Tribunal podrá adoptar su propio criterio en la valoración de la prueba pericial, incluso descartarla, aun si resulta técnicamente correcta. *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021), *citando a González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

De igual modo, las conclusiones de derecho son revisables en su totalidad por este Foro. *Dávila Nieves v. Meléndez Marín*, supra, pág. 770. Ahora bien, como norma general, los tribunales apelativos aceptamos como correctas las determinaciones de hechos de los tribunales inferiores, así como su apreciación de la credibilidad de los testigos y el valor probatorio de la prueba. *Íd.*, pág. 771. Por esta razón, la intervención de este Tribunal en la revisión de la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos solo se justifican en presencia de error manifiesto, prejuicio, parcialidad o pasión. *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022); *Santiago Ortiz v. Real Legacy et al., supra.*

Ahora bien, cuando una parte relacionados con la apreciación o suficiencia de la prueba, tiene el deber de poner al foro apelativo en condiciones de aquilatar y justipreciar el error anotado mediante los mecanismos de transcripción de la prueba, exposición estipulada o exposición narrativa. *Pueblo v. Pérez Delgado*, 211 DPR 654 (2023); *Morán v. Martí*, 165 DPR 356, 366 (2005).

### B. Exigencias de divulgación en los préstamos

La TILA, *supra*, impone unos requisitos mandatorios de divulgación en ciertas transacciones de crédito y préstamo. 15 USC

sec. 1603. Para el momento de los hechos que nos conciernen, estaban exceptuadas aquellas transacciones con fines comerciales, de negocios, agrícolas, o transacciones de crédito que no se iba a adquirir una garantía real sobre bienes inmuebles o bienes personales utilizados o que se preveían utilizar como vivienda principal del prestatario, en los que el monto total financiado excedía los $25,000.00. 15 USC sec. 1603; *Edwards v. McMillen Capital, Inc.*, 574 F. Supp. 3d 52, 66 (2021); *Onyeoziri v. Spivok*, 44 A.3d 279, 284 (2012). La TILA, *supra*, aplica únicamente a las transacciones de crédito al consumo, lo que significa que el crédito debe ser extendido a una persona natural y que el dinero, la propiedad o los servicios estén destinados principalmente para fines personales, familiares o domésticos. TILA, *supra*, sec. 1602 (h). En otras jurisdicciones se ha resuelto que:

> [La TILA, *supra*,] aplica únicamente a las transacciones de crédito garantizadas por bienes muebles o inmuebles utilizados o que se prevé utilizar como vivienda principal del deudor. Las transacciones de crédito garantizadas por bienes inmuebles o personales utilizados para otros fines, como propiedades de alquiler comercial, quedan fuera del alcance de la cobertura de la TILA. (Traducción nuestra). *Onyeoziri v. Spivok*, *supra*; *Jones v. Luthi*, 586 F. Supp. 2d 595, 615 (2008); *Antanuos v. First Nat'l Bank*, 508 F. Supp. 2d 466, 471 (2007).

Las instituciones financieras que otorguen préstamos con tasa de interés variable garantizados por la vivienda principal del prestatario y con un plazo superior a un (1) año, deben proporcionar dos (2) conjuntos de divulgaciones de manera clara y visible conforme al *Reglamento Z*, 12 CFR sec. 1026.19(b). *Monaco v. Bear Stearns Residential Mortg. Corp.*, 554 F. Supp. 2d 1034 (2008). La divulgación inicial se entrega dentro de los tres (3) días hábiles siguientes a la solicitud del préstamo, *Reglamento Z, supra*, sec. 226.19(a)(1)(i) y la divulgación final se entrega al momento del cierre, *Reglamento Z, supra*, sec. 226.19(b). Este último conjunto incluye el cargo financiero, la tasa de porcentaje anual y una declaración de que el préstamo posee una tasa de interés variable, junto con un resumen

de los términos de ajuste. *Monaco v. Bear Stearns Residential Mortg. Corp., supra.*

Del prestamista incumplir con lo anterior, entre otros derechos, el prestatario tiene hasta tres (3) años días hábiles para rescindir el préstamo desde el cierre, la entrega del aviso de rescisión o la entrega de todas las divulgaciones materiales, lo que ocurra último. *Reglamento Z, supra,* sec. 226.23(a)(3). En la eventualidad de que no se entregara el aviso requerido o las divulgaciones materiales, el derecho de rescisión expirará tres (3) años desde el cierre. *Íd.*

Por su parte, *Real Estate Settlement Procedures Act,* 24 CFR sec. 3500.7 (a) (RESPA), requiere que el prestamista entregue al prestatario una estimación de buena fe de los cargos de cierre dentro de tres (3) días hábiles desde que se recibió la solicitud del préstamo. Asimismo, dicho estatuto requería que en o antes del cierre se proveyera el HUD-1 Settlement Statement, en el que se detallara todos los cargos reales asociados con la transacción. RESPA, *supra,* sec. 3500.8 (a). Por otro lado, dentro de los cuarenta y cinco (45) días calendario desde el cierre del préstamo, la RESPA, *supra,* sec. 2609 (c) a través de la *Regulación X,* 12 CFR sec. 1024.17(g), exige que el prestamista entregue al prestatario un *Initial Escrow Account Disclosure Statement* en el que se detalle los pagos estimados del prestatario al fondo de reserva, los desembolsos esperados como los impuestos sobre la propiedad y seguros, más, el saldo proyectado mensualmente durante los siguientes doce (12) meses. La RESPA, *supra,* no es aplicable a préstamos para fines comerciales, de negocios o agrícolas. 24 CFR sec. 3500.5(b)(2); *Patriot Nat'l Bank v. Amadeus B, LLC,* 918 N.Y.S.2d 399, 399 (2010).

### C. Ejecución hipotecaria

Una hipoteca es un derecho real que sujeta o vincula un bien hipotecado para garantizar el cumplimiento de una obligación pecuniaria mediante la exigencia de la realización del valor del bien

gravado y la adopción de medidas para proteger la garantía. *Banco Popular v. Registrador,* 181 DPR 663, 673 (2011).

Una característica de las hipotecas es su carácter accesorio, ya que sirven de garantía para que el acreedor de la obligación principal asegure su crédito ante el incumplimiento con la deuda. *Liechty v. Desartés Saurí,* 109 DPR 496, 501-502 (1980). La hipoteca no tiene existencia autónoma, sino que depende de la obligación principal que asegura. *Íd.* En consecuencia, su validez está sujeta a la vigencia del crédito garantizado. *Íd.* Así, si dicho crédito se extingue, ocurre lo mismo con la hipoteca; si se transmite, también lo hace la garantía; y si el crédito resulta nulo o ineficaz, igual la hipoteca. *Íd.*

El acreedor hipotecario, como titular del derecho real, conserva la facultad de satisfacer su reclamación mediante la venta del bien gravado, tal como el deudor consintió al otorgar el contrato de hipoteca. *Íd.* Esta prerrogativa subsiste incluso si el inmueble está en posesión de un tercero. L. R. Rivera Rivera, <u>*Derecho Registral Inmobiliario Puertorriqueño*</u>, 3ra ed., San Juan, Ed. Jurídica Editores, 2012, pág. 485. En efecto, una vez venció el crédito asegurado en todo o en parte sin que el deudor lo haya satisfecho, el acreedor tiene derecho a ejercer los mecanismos que le provee el ordenamiento jurídico para satisfacer el crédito hipotecario. *Íd.*, págs. 567-568.

### D. Causa de los contratos

El Artículo 1226 del Código Civil, 31 LPRA sec. 3431 (derogado) dispone que se entiende por causa de un contrato la prestación o la promesa de una cosa o servicio por la otra parte en los remuneratorios, el servicio o el beneficio en los contratos onerosos y la mera liberalidad del bienhechor en los contratos de pura beneficencia. Además, establece que aunque la causa de un contrato no se exprese, se presume que existe y que es lícita mientras el deudor no demuestre lo contrario. Art. 1229 del Código Civil, *supra,* sec. 3434. Pues, los contratos sin causa o con causa ilícita no

producen efecto alguno. Art. 1227 del Código Civil, *supra,* sec. 3432. Se define como causa ilícita aquella que se opone a la ley o la moral. *Íd.* En particular, hay dos tipos de causa ilícita: la causa ilegal que se opone a las leyes y la causa inmoral o torpe que se opone a la moral y a las buenas costumbres. *Dennis, Metro Invs. V. City Fed. Savs.*, 121 DPR 197 (1988). "Es ilícita la causa no sólo cuando el contrato per se es prohibido, sino cuando mediante él se trata de ocasionar a otra un daño o perjuicio ... cuando se pretende cometer un fraude". *Íd., citando a* L. Diez-Picazo, Vol. I, *Fundamentos del Derecho Civil Patrimonial,* Madrid, Tecnos, 1979, pág. 168.

La expresión de una causa falsa en los contratos da lugar a su nulidad, a menos que se pruebe que estaba fundada en otra verdadera y lícita. Art. 1228 del Código Civil, *supra,* sec. 3433. Por su parte, el Artículo 1252 del Código Civil, *supra,* sec. 3511, dispone que los contratos pueden anularse si adolecen de algunos de los vicios que los invalida. Es decir, si el consentimiento se prestó por error, violencia, intimidación o dolo. Art. 1217 del Código Civil, *supra,* sec. 3404. El término prescriptivo durará cuatro (4) años desde que cesó la violencia o intimidación o desde que se consumó el contrato cuando existió error, dolo o falsedad de la causa. Art. 1253 del Código Civil, *supra,* sec. 3512. Una vez se declara nula la obligación, los contratantes deben restituir recíprocamente las cosas del contrato, con sus frutos y el precio de los intereses, excepto que la nulidad se deba a causa torpe o ilícita, en cuyo caso prevalece el criterio de la culpa o torpeza atribuible a las partes. Art. 1255 del Código Civil, *supra,* sec. 3514; *Bosques v. Echevarría,* 162 DPR 830 (2004).

### E. Fe pública notarial

El Artículo 2 de la *Ley Notarial*, Ley Núm. 75 de 2 de julio de 1987, 4 LPRA sec. 2002, según enmendada, consagra el principio de la fe pública notarial de la siguiente manera:

> El notario es el profesional del Derecho que ejerce una función pública, autorizado para dar fe y autenticidad conforme a las leyes, de los negocios jurídicos y demás actos y hechos extrajudiciales que ante él se realicen, sin perjuicio de lo dispuesto en las leyes especiales. Es su función recibir e interpretar la voluntad de las partes, dándole forma legal, redactar las escrituras y documentos notariales a tal fin y conferirle autoridad a los mismos. La fe pública del notario es plena respecto a los hechos que, en el ejercicio de su función personalmente ejecute o compruebe y también respecto a la forma, lugar, día y hora del otorgamiento.

Esta disposición reafirma que el notario no actúa como un simple legalizador de firmas de forma automática, sino que debe velar porque todo instrumento público cumpla con los requisitos legales, sea verdadero, y refleje una transacción legítima y válida. *In re Sánchez Reyes*, 204 DPR 548, 566 (2020). Además, como depositario de la fe pública, el notario tiene el deber ineludible de propiciar y garantizar un estado de conciencia informada en los otorgantes. *In re Pérez*, 104 DPR 770, 776 (1976). Es decir, su deber es asesorar imparcialmente a todos los otorgantes de forma que comprendan plenamente los acuerdos que habrán de formalizar mediante la firma del instrumento público. S. Torres Peralta, *El Derecho Notarial Puertorriqueño*, Edición Especial, First Book Publishing of PR, Puerto Rico, pág. 1.6. Pues, a diferencia del abogado, el notario no representa a ninguna parte, sino que encarna la fe pública notarial. *Íd.*

El Estado delegó en el notario la facultad de que todo lo que exprese en los documentos bajo su firma, signo, sello y rúbrica se tenga por cierto, sin necesidad de prueba adicional. C. R. Urrutia De Basora & L. M. Negrón Portillo, *Curso de Derecho Notarial Puertorriqueño*, 3ra ed., 2002, pág. 10. Cuando el notario estampa su firma, signo, sello y rúbrica en un documento, compromete su título y garantiza que los hechos consignados ocurrieron tal como se describieron en el documento. *Íd.*, pág. 11. En efecto, el notario aporta credibilidad, autenticidad y certeza jurídica a todo documento en el que interviene. *Íd.*, pág. 10. Esta afirmación goza de presunción *juris tantum* a favor de la veracidad del instrumento notarial que

prevalece en ausencia de evidencia en contrario y desplaza el peso de la prueba hacia quien impugna su contenido. *Íd.*; véase *Deliz et als. v. Igartúa et als.,* 158 DPR 403 (2003).

En lo que respecta a la fe de conocimiento, para que el notario pueda dar fe de la identidad de los otorgantes, es indispensable que cada uno de ellos comparezca físicamente al acto notarial y exprese su consentimiento en presencia del notario autorizante. S. Torres Peralta, *op. cit.,* pág. 9.2. Asimismo, es necesario que los comparecientes sean conocidos del notario o, en su defecto, que verifique su identidad mediante los medios supletorios que dispone la *Ley Notarial, supra. Íd.* Al respecto, el Máximo Foro Judicial indicó:

> **La Ley no exige el conocimiento "personal" de otorgantes por el notario en el concepto de una relación previa a su llegada a la notaría. Basta el conocimiento que el notario deriva de su observación de los otorgantes identificándose mutuamente en las etapas preliminares del acto jurídico notarial, toda vez que, con rarísimas excepciones en que dos partes se ponen de acuerdo para defraudar, los otorgantes tienen tanto interés como el notario en la transmisión de un título válido, y debe suponerse que en los contratos bilaterales el que contrata con una persona obligándose a su favor y estipulando derechos, le conoce perfectamente. El notario no está restringido en sus medios para identificar otorgantes al uso de testigos de identificación. Su profesión de abogado le provee variados recursos para asegurarse de tal identidad.** *In re Cancio Sifre,* 106 DPR 386 (1977) (Énfasis nuestro).

### F. Temeridad

La Regla 44.4 (d) de Procedimiento Civil, *supra,* R. 44.4 (d), faculta que un tribunal imponga el pago de una suma por concepto de abogado a la parte que haya procedido con temeridad durante el litigio. *Pereira v. IBEC,* 95 DPR 28 (1967). La temeridad es el comportamiento terco, obstinado, contumaz y sin fundamentos de un litigante que obliga al otro a asumir los gastos y el trabajo de un pleito que se pudo evitar o que se prolongó innecesariamente. *Marrero Rosado v. Marrero Rosado,* 178 DPR 476, 504 (2010); *SLG Flores-Jiménez v. Colberg,* 173 DPR 843, 866 (2008); *Rivera v. Tiendas Pitusa,* 148 DPR 695, 703 (1999). Ello, salvo que la controversia planteada implique una cuestión de derecho novedosa. R. Hernández

Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 6ta. ed., Lexisnexis de Puerto Rico, Inc., San Juan, 2007, pág. 437.

El objetivo de esta sanción es desalentar litigios infundados y promover la resolución de controversias, mediante un mecanismo que compense a la parte prevaleciente por los perjuicios económicos y las cargas generadas por la actitud irrazonable de su contraparte. *Marrero Rosado v. Marrero Rosado, supra.* Además, castiga a quien, por su actitud inflexible, obliga a la otra parte a incurrir en los inconvenientes de un pleito. *Torres Vélez v. Soto Hernández*, 189 DPR 972, 993 (2013); *COPR v. SPU*, 181 DPR 299 (2011).

La valoración de si una conducta constituye temeridad queda sujeta a la sana discreción del juzgador. *COPR v. SPU, supra.* No obstante, este Tribunal de Apelaciones intervendrá con la decisión del tribunal de instancias si medió un abuso de discreción. *SLG Flores-Jiménez v. Colberg, supra*, pág. 866.

A la luz de la normativa jurídica antes expuesta, procedemos a resolver.

**III.**

En el presente caso, CACSI planteó que el TPI incurrió en múltiples errores al impedir que completara la presentación de prueba para demostrar la existencia de una deuda vencida, líquida y exigible, y al valorar erróneamente la prueba pericial, ignorando la fe notarial. Además, indicó que el Foro apelado adjudicó daños sin prueba suficiente, declaró temeridad sin base legal y anuló documentos notariales y el pagaré sin prueba clara de vicio en el consentimiento. Ante ello, sostuvo que estas determinaciones resultaron en la validación de una reconvención y en un enriquecimiento injusto por parte del apelado.

Tras un análisis sosegado del expediente ante nuestra consideración, concluimos que le asiste la razón a la apelante.

Para que el señor Dedós Colón pudiera atribuirle incumplimiento a CACSI por incumplimiento con la TILA, *supra*, debía igualmente cumplir con su obligación de firmar los documentos faltantes. Dichos documentos no pudieron ser completados en la noche del cierre debido a que ya era tarde y se dañó la impresora, situación que pospuso la culminación del proceso de entrega de documentos exigido por la reglamentación federal. Sin embargo, ello no ocurrió, dado que el apelado posteriormente se negó a firmar los documentos, lo que no permitió la formalización del trámite conforme a los requerimientos aplicables.

Por otro lado, la evidencia admitida de este caso acreditó que el señor Dedós Colón firmó la escritura de hipoteca, el pagaré y el contrato de prenda el 31 de enero de 2007 ante la licenciada Pérez López, notario público cuya fe pública goza de presunción *juris tantum* de veracidad que no fue rebatida satisfactoriamente por el apelado. La notario declaró que conocía previamente al señor Dedós Colón y que observó cuando firmó personalmente los documentos, incluyendo el pagaré, sin objeción de su parte ni del abogado que lo acompañaba, el licenciado Fernández Nadal. A tenor con el Artículo 2 de la *Ley Notarial, supra,* sec. 2002, el notario ejerce una función pública que otorga autenticidad plena a los actos realizados ante sí. Tal credibilidad plasmada en los documentos objeto de este pleito solo podía ser desplazada por evidencia en contrario, lo cual no ocurrió en este caso.

Asimismo, no se podía invalidar un negocio jurídico válidamente constituido sobre la base de que el señor Dedós Colón firmó los documentos sin haberlos leído. Esa omisión de su parte no podía imputarse a la apelante, no podía utilizarse como excusa retroactiva para invalidar la eficacia jurídica del acto celebrado, ni constituyó vicio del consentimiento. No se puede pretender anular un contrato por la negligencia del otorgante al no examinar el contenido

de lo que suscribió, especialmente cuando no se alegó ni probó que CACSI le restringió la lectura o evaluación de los documentos antes de su firma. Del examen de los documentos notariales y formularios relacionados al cierre del préstamo, surge inequívocamente que el señor Dedós Colón contrajo una obligación por la suma de $128,000.00, a un interés anual de 9%, con un plazo de amortización de trescientos sesenta (360) meses. En ausencia de prueba de error, violencia, intimidación o dolo, no procedía invalidar el consentimiento prestado ni anular el contrato válidamente otorgado.

Además, el TPI anuló el pagaré y los documentos notariales basándose en una falsificación de firma y vicios en el consentimiento, sin causa torpe ni dolo probado. No se demostró que el consentimiento del Sr. Dedós Colón fue viciado por error, violencia, intimidación o dolo, máxime cuando firmó los documentos en presencia de una notario, con representación legal.

La determinación de que la firma del señor Dedós Colón en el pagaré fue una burda imitación quedó refutada por el testimonio no impugnado de la notario autorizante, quien declaró haber identificado debidamente al apelado y haber presenciado personalmente su firma, sin que mediara objeción alguna del propio apelado ni de su representante legal, quien lo acompañaba en ese momento. Además, el Foro Primario concluyó que la firma del Sr. Dedós Colón fue imitada en varios documentos relacionados con el préstamo hipotecario, a saber: el pagaré hipotecario, la solicitud final del préstamo, el aviso de no aceptación del seguro de vida, el *Initial Escrow Account Disclosure Statement* y la hoja de información para seguros de propiedad. Sin embargo, de una observación detenida de la documentación obrante en el expediente, se desprende que tanto el aviso de no aceptación del seguro de vida como la solicitud final del préstamo, conocido como *Uniform Residential Loan Application,* no estaban firmados por el señor Dedós Colón. Afirmar que dichos

documentos fueron objeto de falsificación, cuando precisamente carecen de la firma del apelado, desvirtuó la evidencia documental disponible y constituyó un error manifiesto en la apreciación de la prueba.

Tampoco consta evidencia admisible que respalde la conclusión del TPI de que los funcionarios de CACSI actuaron de forma dolosa o fraudulenta al incluir partidas falsas, superfluas o irrazonables, ni que hayan variado ilegal y unilateralmente la solicitud del préstamo. Tampoco se probó que CACSI hubiera incurrido en representación falsa, ocultación maliciosa de información o desviación sustancial de los términos contractuales.

Por otro lado, el Tribunal apelado erró de forma manifiesta al declarar nulo el contrato de préstamo suscrito entre CACSI y el señor Dedós Colón, sin resolver el destino y efecto jurídico de las contraprestaciones recibidas por el apelado. En el expediente obró prueba testimonial y documental, no impugnada sustancialmente, que acreditó la emisión y desembolso de múltiples cheques por parte de la apelante con el propósito expreso de saldar deudas personales del señor Dedós Colón, cancelar obligaciones previas con la misma cooperativa y otras instituciones, liquidar la SLG, cubrir gastos notariales y adjudicar un sobrante al apelado. A pesar de ello, el TPI obvió adjudicar la devolución de estas contraprestaciones, permitiendo así que el apelado se beneficiara del préstamo y se eximiera de su obligación del reembolso o el pago de las mensualidades. Ello, en ausencia de prueba suficiente de fraude, intimidación o error sustancial, y considerando que el pagaré fue firmado en presencia de un notario cuya fe pública se presume válida. Este Tribunal no puede avalar una determinación que permita al señor Dedós Colón retener la totalidad de los fondos prestados y, simultáneamente, ser eximido de su obligación de pago sin haber

demostrado de manera clara y convincente que su consentimiento fue viciado o que la causa del contrato fue ilícita.

En atención a lo anterior, no se sostiene la determinación apelada de declarar Con Lugar la *Reconvención* presentada por el apelado. Al no probarse la existencia de fraude ni de vicios en el consentimiento, procede la revocación de los remedios indemnizatorios por concepto de daños económicos y angustias mentales.

De otra parte, el Foro Primario incluyó en su determinación de hechos que el perito calígrafo Álvarez Ghigliotti alegó falsamente haber trabajado para el FBI. Sin embargo, este testificó bajo juramento que solo tomó cursos de adiestramiento con dicha agencia, nunca afirmó haber sido su empleado. Este error factual minó su credibilidad, lo que constituyó un error manifiesto en la apreciación de la prueba por parte del Tribunal *a quo*.

Además, el TPI incurrió en error al impedir que CACSI culminara la presentación de su prueba. La exclusión del testimonio pendiente de la señora Morales Cruz y de la certificación de deuda constituyó una acción perjudicial, especialmente cuando de la TPO surgió claramente que la jueza acordó que el documento sería presentado en la vista siguiente. Al no permitir completar el desfile probatorio, el TPI impidió que CACSI demostrara que el crédito era vencido, líquido y exigible, elemento esencial de su reclamación de cobro de dinero y ejecución hipotecaria. Esta exclusión fue la base para que el TPI concluyera que no se había probado la existencia de deuda y desestimara la *Demanda*. De esta forma, el Tribunal apelado utilizó esa omisión como base para erróneamente declarar temeridad, aun cuando las cuestiones de hecho y derecho objeto de este pleito no provocaron que el mismo fuese frívolo ni dilatorio.

En suma, el TPI cometió múltiples errores de derecho y de apreciación de la prueba que afectaron su determinación. Tales

errores justifican la revocación de la *Sentencia* apelada y la remisión del caso para que se adjudique correctamente la obligación contractual, el destino de las contraprestaciones y los remedios legales aplicables.

**IV.**

Por los fundamentos que anteceden, se revoca el dictamen apelado. Se devuelve el asunto al Foro de Origen para la continuación de los procedimientos de conformidad con lo dispuesto en la presente Sentencia.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones